## SHERLOCK ET AL. *v.* ALLING, ADM'R.

PRACTICE.—*Motion to Strike Out.*—It is not error to strike out allegations of an answer that are put in issue by the averments of the complaint and a general denial in answer.

JURISDICTION.—*Ohio River.*—The State of Indiana possesses concurrent jurisdiction with the State of Kentucky, for the enforcement of civil and criminal laws on the Ohio river, where the two States possess the opposite shores.

SAME.—*How Exercised.*—The jurisdiction may be exercised in such manner as the State shall elect.

SAME.—*To What it Extends.*—Such jurisdiction is not limited to the service of process or to judicial proceedings, but is general, and includes the right of legislation touching all civil and criminal cases on the river.

SAME.—*Statute.*—*Death Caused by Wrongful Act.*—Section 784 of the code (2 G. & H. 330) is general and extends over all territory over which the State of Indiana has exclusive or concurrent jurisdiction. It applies to cases where death is caused by wrongful acts or omissions, on vessels whilst navigating the Ohio river under license under the acts of Congress, by the owners or their agents, officers, and servants in charge of such vessels; and it is not invalid as tending to regulate commerce among the states, or as hindering or obstructing the free use of the license under which such owners may be navigating the river.

DAMAGES.—*Injury Causing Death.*—*Money Received on Insurance Policy.*—In an action for an injury causing death, brought under section 784 of the code, the receipt of money by those for whose benefit the action is brought, on a policy of insurance on the life of the deceased, cannot be shown, for the purpose of reducing the amount of recovery.

CARRIERS OF PASSENGERS.—*Degree of Care.*—The law imposes upon the owners of boats engaged in carrying passengers, their agents, servants, and employees, the duty of exercising the highest degree of care in the navigation and management of their boats, but they are not insurers or bound to carry passengers safely at all events.

SAME.—*Two Boats Running on Same Line.*—Where two boats are owned by the same persons, running on the same line, and carrying passengers, such owners cannot escape liability for an injury causing the death of a passenger, by a discharge of their duty on the particular vessel upon which the deceased was a passenger, but they must exercise the same care and vigilance in the management of the other boat.

SAME.—*Burden of Proof.*—If the employees engaged in navigating such boats saw each the other boat, while they were two or three miles apart, and the boats were accustomed to pass at and about the same point, and the river was wide enough for them to pass at that point without danger, with proper care, and a collision occurred there, such circumstances tend to show negligence; and it devolves on the defendants to show that the collision was not caused by their neglect or omission; and in such case if some sudden, unexpected

Sherlock *et al. v.* Alling, Adm'r.

thing occurred just before the collision, which could not with due care have been avoided, it is for the defendants to show it.

SAME.—In an action against the owners of two steamboats, engaged in carrying passengers on the same line, where one boat is ascending and the other descending a river, for an injury causing the death of a passenger upon one of the boats, the burden of proof of all material facts of carelessness causing the death remains with the plaintiff and does not change in any progress of the cause; but if the plaintiff shows that the descending boat departed from the rules of navigation and gave the first signal to pass, then the burden of proof is upon the defendants to show that there was a necessity for it.

PRACTICE.—*Motion for New Trial.*—A motion for a new trial for error in the admission or exclusion of evidence is too indefinite to raise any question, where neither the name of the witness nor the character of the testimony is specified.

WITNESS.—*Action by Administrator for Injury Causing Death.*—In an action by an administrator for an injury causing death, the defendant is not a competent witness to testify on his own behalf.

From the Switzerland Common Pleas.

*T. D. Lincoln, C. E. Walker,* and *W. S. Roberts,* for appellants.

*H. W. Harrington* and *C. A. Korbly,* for appellee.

OSBORN, J.—This action was instituted, to recover damages for the death of Otis B. Sappington, under section 784 of the code, 2 G. & H. 330, which is as follows:

" When the death of one is caused by the wrongful act or omission of another, the personal representatives of the former may maintain an action therefor against the latter, if the former might have maintained an action had he lived, against the latter for an injury for the same act or omission. The action must be commenced within two years. The damages cannot exceed five thousand dollars, and must inure to the exclusive benefit of the widow and children, if any, or next of kin, to be distributed in the same manner as personal property of the deceased."

Alling, administrator of Sappington, brought the suit. The complaint contains four paragraphs, each charging in different ways that the appellants were the owners of a line of steamboats navigating the Ohio river between the port and city of Cincinnati, in the State of Ohio, and the port

and city of Louisville, in the State of Kentucky, for the avowed purpose of carrying passengers, freight, and the United States mail between those places; that they owned and were running in that line and business the steamboats "United States" and "America;" that Sappington was a passenger on the United States; that by reason of the carelessness and negligence of the servants and employees of the appellants, in charge and engaged in the management of the boats, they collided and caused the death of Sappington, without his fault, at the county of Switzerland and within the territorial jurisdiction of this State; and that he left a widow and children, naming them.

There was a separate demurrer to each paragraph overruled, and exceptions taken to the ruling. But as it is admitted by counsel for the appellants, that the paragraphs set out the causes of action with sufficient certainty, and as they are very lengthy, we do not consider it necessary to make any further statements of their averments.

The defendants filed an answer consisting of nine paragraphs. 1st. That the collision occurred on the Ohio river between low-water mark on the Indiana side thereof and the Kentucky shore, and within the limits of the State of Kentucky and wholly outside of this State. 2d. The same as the first, and, in addition thereto, an act of the State of Kentucky, in force at the time of the collision; that prior to its passage and outside of the provisions thereof, there was no liability within that State for damages for loss or injury, resulting in death, and that the suit must be brought in one year. That act is set out in full in the answer. It gives the right to sue to the personal representatives of any person whose life is lost by the wilful neglect of another person or persons, etc., against such persons, etc., and to recover punitive damages for the loss or destruction of the life. 3d. This paragraph alleges that the defendants were using the boats in carrying on commerce among the states, under the laws of the United States, and a license regularly issued, and that they were duly enrolled, equipped, and

manned under such laws; an allegation of the same facts contained in the first paragraph; that the defendants were not on board of, or in any way engaged in the management of, the boat, and that the injuries did not result from the want of care of the defendants or either of them. 4th. This paragraph, after averring that the defendants know nothing of the death of Sappington, or the appointment of the plaintiff as his administrator, alleges that they have no knowledge that Sappington was a passenger on board of the boat at the time specified in the complaint, specifically denies each of the several acts of carelessness alleged against them, that they were navigating either of the boats in the county of Switzerland, in this State, above low-water mark, that the United States was burned within the limits and jurisdiction of this State, and avers that if Sappington was suffocated and burned to death, it was not within the limits of Indiana. The 5th paragraph was a general denial. 6th. This paragraph set up in bar of a part of the damages an insurance of three thousand dollars on the life of Sappington, for the benefit of his widow and children, which had been paid. 7th. In this paragraph it was stated that the alleged negligence, which caused the death of Sappington, occurred upon the Ohio river, beyond and outside of low-water mark on the Indiana side, and within the territorial limits of the State of Kentucky; that by the action of the current and the motion of the United States, she drifted inside such low-water mark before she sank and before the death of Sappington, but that the acts, if any, which caused his death took place and were done within the territorial limits of Kentucky. 8th and 9th. These paragraphs deny the jurisdiction of the court over the subject-matter of the action; the eighth, because the negligent acts complained of, as causing the death of Sappington, were done within the State of Kentucky and not in this State, and the ninth, because the boats were carrying on commerce among the states under regular license and enrolment, and were duly equipped and manned under the provisions of the act of

Congress in such cases, and they were in such navigation to be governed and controlled only by the laws of the United States.

A motion was made to strike out the first, second, fourth, and seventh paragraphs of the answer, and so much of the third as set up the same facts stated in the first. Also, separate demurrers to the third, sixth, eighth, and ninth paragraphs. The motion to strike out was sustained, except as to the second paragraph, and overruled as to that. The demurrer was also sustained. Proper exceptions were taken by both parties. This left the second, fifth, and eighth paragraphs of the answer.

The appellee filed a reply to the second and eighth paragraphs of the answer, consisting of three paragraphs. The first alleged, among other things, that the first contact of the boats occurred on the north and Indiana side of the centre and thread of the stream of the Ohio river, and ten feet below low-water mark on the Indiana side of the river, and that, by the force of the momentum of the boat, the United States did pass thirty yards above low-water mark on the Indiana side; that after she had been thus driven above low-water mark, she caught fire and burned Sappington to death; and that he then and there died, thirty feet above low-water mark.

The second states that the steamers came in contact north of the thread and centre of the Ohio river, and between the centre thread of the stream and the Indiana shore, and thirty feet nearer the Indiana shore than the centre thread of the stream; and all the injuries to Sappington were given, and his death took place, more than thirty feet nearer the Indiana shore than the thread of the river, on the Indiana side thereof; and that the injuries and death of Sappington took place in the county of Switzerland, and in the territorial jurisdiction of this State.

The third was a general denial.

A joint demurrer was filed to the first and second para-

graphs of the reply, which was overruled, and an exception taken.

The cause was tried by a jury, who rendered a verdict for the plaintiff for the sum of five thousand dollars.

The jury also answered interrogatories submitted to them, by which they found that the collision of the two boats took place, that the United States sunk and burned up, and Sappington perished and died on the United States, by reason of the collision and burning of the last named boat, and that it all happened and took place above low-water mark on the Indiana side of the Ohio river.

The appellants filed a motion stating fourteen causes for a new trial, which was overruled, to which they excepted, and judgment was rendered against them on the verdict of the jury.

They appeal and have assigned nine errors.

The court committed no error in sustaining the motion to strike out the first, seventh, and a part of the third, paragraphs of the answer. The matters therein alleged were put in issue by the averments of the complaint and the general denial. They were undoubtedly filed to test the question of the jurisdiction of this State on the Ohio river, below low-water mark.

The theory of the defence is, that the State has no such jurisdiction, and that the cause of action arose below low-water mark. The question has been argued by counsel on both sides, although counsel for the appellee insist that the answers of the jury to the interrogatories settle the question that it arose above.

The court instructed the jury that the territorial limits of this State on the south-east is the low-water mark on this side of the Ohio river; that it has concurrent jurisdiction with the State of Kentucky, for the enforcement of her civil and criminal laws, over the Ohio river as far as it forms the boundary line of this State. The court also instructed them that low-water mark means the lowest point to which the water of the river comes down, in the lowest stage, by reason

of dry seasons; that the bottom or ground thus left dry, extending out from the shore and connecting with it by ground or bottom, not covered with water, belongs to Indiana, though it be covered with water at a higher stage.

It is contended by the counsel for the appellants, that the alleged carelessness which led to the collision, as well as the collision itself, took place below ordinary low-water mark, which, it is insisted, is the true line, and that the finding of the jury, that it occurred above, was in consequence of the above instructions, defining the meaning of low-water mark. It is also contended that such carelessness, the collision, and the death of Sappington must have occurred in this State, to entitle his administrator to maintain this action.

We do not consider it necessary to decide whether the true line is at ordinary or the lowest low-water mark. We are not prepared to say that the instruction, that the latter was the true one, was erroneous. If it is erroneous, then there may be times when dry land on this side the water of the river will be in Kentucky.

Chief Justice MARSHALL, in *Handly's Lessee* v. *Anthony*, 5 Wheat. 374, 4 Pet. U. S. Cond. Rep., on p. 695, says: "If it be true, that the river Ohio, not its ordinary bank, is the boundary of Indiana, the limits of that State can be determined only by the river itself. The same tract of land cannot be sometimes in Kentucky, and sometimes in Indiana, according to the rise and fall of the river. It must be always in the one state, or the other." And again, on page 696: "The State of Virginia intended to make the great river Ohio, throughout its extent, the boundary between the territory ceded to the United States and herself." And it was held that low-water mark on this side of the river was the boundary line between this State and Kentucky. But as we have already said, we do not decide the question.

Nor do we deem it necessary to decide whether the carelessness, which led to the collision and death, happened above or below low-water mark.

We have carefully considered the question presented by

the instruction, touching the jurisdiction of this State on the Ohio river, and are of the opinion that such jurisdiction exists. *Carlisle* v. *The State*, 32 Ind. 55. In that case, a murder was committed on the Ohio river outside the territorial limits of Spencer county, in this State, but opposite thereto, and it was held that the court of that county had jurisdiction of the offence.

An act of the commonwealth of Virginia entitled " an act concerning the erection of the district of Kentucky into an independent state," passed December 18th, 1789, provides : " That the use and navigation of the river Ohio, so far as the territory of the proposed state, or the territory which shall remain within the limits of this commonwealth lies therein, shall be free and common to the citizens of the United States ; and the respective jurisdictions of this commonwealth and of the proposed state, on the river as aforesaid, shall be concurrent only with the states which may possess the opposite shores of the said river." Rev. Laws of Va., vol. 1, p. 59, 1 G. & H. 57.

Sec. 2, art. 14, of the constitution of this State, 1 G. & H. 53, declares that the State shall have such concurrent jurisdiction. The same jurisdiction is asserted by the General Assembly in the article defining the boundaries of counties. See 1 G. & H. 190, sec. 93 ; *Id.* 191, sec. 96.

The case of *McFall* v. *Commonwealth,* 2 Met. Ky. 394, was this : McFall was indicted in Kentucky for unlawfully solemnizing a marriage. His defence was, that he was authorized by the laws of Ohio to solemnize marriages in that State, and that the alleged offence consisted in the exercise of such authority on the Ohio river, on the ferryboat midway on the river. The court held it to be no defence. The court, on page 398, says : " The word jurisdiction, as applied to a state, and as used in the compact with Virginia, imports nothing more than the power to govern by legislation ; and without legislative enactments to enforce and carry out the jurisdiction so conferred, it cannot, of itself, be regarded as operative, or effectual to protect the appellant,

or defeat the right of our own tribunals to enforce and execute our own penal and criminal statutes."

*Garner's Case*, 3 Grat. 655, like *McFall* v. *Commonwealth*, held that low-water mark was the true line, although the court was divided on the question; the minority holding that it should be high-water mark. There seemed to be no question about the concurrent jurisdiction on the river. ROBERTSON, one of the minority, on page 714, says: Access, the innocent use and free navigation of the river and jurisdiction, are all that Ohio can want or have under the cession." JOHNSTON, one of the majority, speaking of Virginia, says: "She chose to divide her jurisdiction over it (the river) with the State of Ohio, but she did not divide her dominion over the soil." The term "river" in the compact is construed in connection with "jurisdiction," as embracing the whole water of the river, without reference to high or low-water mark; to whatever is afloat on the water and not connected with the shore; whilst the same term is construed in connection with the boundary line of the states and the determination of titles to property, as meaning low-water mark.

In *Handly's Lessee* v.*Anthony*, 5 Wheat. 374, it was taken for granted that the jurisdiction of the states possessing the opposite shores of the river was concurrent.

We have seen that this State possesses concurrent jurisdiction with the State of Kentucky, on the river at the place where the cause of action, if any, arose. The jurisdiction may be exercised in such manner as the State shall elect. It was exercised in unmistakable language in the constitution, by declaring that the State possesses such concurrent jurisdiction, in civil and criminal cases, with the State of Kentucky. The jurisdiction, which the State possesses, is not limited to the service of process. It is general and includes the right of legislation, touching all civil and criminal cases on the river. To confine the meaning of the words, civil and criminal cases, to the mere service of process in such

cases would fail to accomplish the purposes of the constitution in asserting its jurisdiction.

The jurisdiction asserted by the constitution is not limited to judicial proceedings in civil and criminal cases.  It is such as the State may choose to exercise, touching such actions, and legislation is included.   There being no common law offences in this State, and our criminal law being entirely statutory, there can be no criminal case without legislation.  *Hackney* v. *The State*, 8 Ind. 494;  *Beal* v. *The State*, 15 Ind. 378.  The General Assembly legislated on the subject, and this court held that the offence defined, though committed on the river outside the boundaries and sovereignty of the State, was punishable in the court of a county bordering on the river, on the ground that the jurisdiction of the State was concurrent with the State of Kentucky on the river.  *Carlisle* v. *The State, supra.*

The law, under which this action is brought, is a general one, not limited or restricted as to the place where it is to be in force.  We think that laws enacted by the General Assembly extend to, and are in force in, the territory over which the jurisdiction of the State is concurrent, as fully as when it is exclusive, without any special or particular provision on the subject.   We know of no reason requiring a legislative declaration, specifying the territory in which the act shall be in force in one case, which does not apply equally in both. The jurisdiction is given by the cession and in the constitution, in general terms.   The only difference is, that over the territory within the boundaries of the State it is exclusive, whilst on the river it is concurrent with Kentucky.   When the right of legislation is exercised by a general enactment, it must be regarded as an expression of the will of the legislature that such enactment shall be in force wherever the State has jurisdiction, unless the contrary appears.   We cannot say that a failure of the legislature to specially include territory, over which its jurisdiction is concurrent with another state, shall be considered as an intention to exclude

it from the operation of the law. On the contrary, we think the intention to include all the territory over which it has jurisdiction will be presumed.

Our conclusion is, that the State of Indiana possesses concurrent jurisdiction with the State of Kentucky on the Ohio river, where the two states possess the opposite shores, although for the purpose of determining the boundaries, low-water mark on the north-west side of the river is the true line, and that Indiana, prior to the injury complained of in this case, had asserted and exercised such jurisdiction in her constitution and by appropriate legislation, and consequently the question, whether one state can pass a law, fixing the rights and liabilities for acts and conduct in another, does not arise in this case.

It is also insisted that, even if the wrongful act or omission, the collision of the two boats, and the death, all took place on the Ohio river, within the jurisdiction of this State, and if the law in question was in force there at the time, it could not fix liability upon the appellants in this action, because the boats were at the time engaged in commerce among the states, under the laws of the United States. It is claimed that to do so would be an infringement, by the State, upon the exclusive power of Congress to regulate commerce among the states. After a pretty careful examination of authorities bearing upon the question, our conclusion is adverse to the position taken by the appellants. We are unable to see how the law in any manner attempts to regulate commerce. It requires the performance of no new duty; imposes no tax upon property engaged in commerce; makes no rules or regulations controlling or limiting the free and uninterrupted use of the vessels. So far as the provisions of the law in question are concerned, the boats of the appellants and the appellants themselves were as free from interruption in carrying on commerce among the States and in exercising all the rights conferred upon or enuring to them, by reason of a compliance with the acts of Congress, as if the law had never existed.

An examination of the decisions of the courts, holding a state law invalid, on the ground that it conflicted with the power of Congress to regulate commerce, will show, we think, that such decisions were made because the law imposed some burden or tax, or prescribed some rules, limitations, or conditions, regulating or affecting such commerce. *Gibbons* v. *Ogden,* 9 Wheat. 1 ; *Brown* v. *State of Maryland,* 12 Wheat. 419 ; *Halderman* v. *Beckwith,* 4 McLean, 286 ; *The People* v. *The Rensselaer,* etc., *R. R. Co.,* 15 Wend. 113,131 ; *Perry* v. *Torrence,* 8 Ohio, 521 ; *Passenger Cases,* 7 How. 283, 573 ; *Hays* v. *The Pacific M. S. Co.,* 17 How. 596 ; *Gilman* v. *Philadelphia,* 3 Wal. 713 ; *Crandall* v. *State of Nevada,* 6 Wal. 35 ; *Steamship Co.* v. *Portwardens,* 6 Wal. 31 ; *Sinnot* v. *Davenport,* 22 How. 227 ; *State Tonnage Tax Cases,* 12 Wal. 204.

*Hays* v. *The Pacific M. S. Co.,* 17 How. 596, held that the vessels employed in commerce among the states were not liable to taxation in a state in which the owners did not reside. On pages 599, 600, the right to tax the vessels at the home port is clearly recognized. The *Passenger Cases* held that the states could not, under the name of health laws, require the captain of a vessel to pay health commissioners a sum of money for passengers arriving on his vessel. These cases were decided by a bare majority. TANEY, Chief Justice, and Justices DANIEL, NELSON, and WOODBURY dissented. *Sinnot* v. *Davenport* held that the State of Alabama could not require the owners of a boat navigating the waters of that State, to file a written statement in a court setting forth the name of the vessel, the names of her owners, and their interest in the vessel, on the ground that it was in conflict with the act of Congress on the subject. In *Steamship Co.* v. *Portwardens,* 6 Wal. 31, it was held that an act of Louisana providing that the masters and wardens of a port within it should be entitled to fees, whether called on to perform services or not, for every vessel arriving in that port, was a regulation of commerce within the meaning of the constitution, and therefore void. In *Gibbons* v. *Ogden,* it was held that the laws of New York, granting to Livingston

and Fulton the exclusive right to navigate the waters of that State with steamboats, were in collision with the acts of Congress regulating the coasting trade, which being made in pursuance of the constitution were supreme, and the state laws must yield to that supremacy. In that case, Chief Justice MARSHALL, in delivering the opinion of the court, said that inspection laws, although they had a remote and considerable influence on commerce, quarantine laws, and health laws of every description, form a portion of that immense mass of legislation, which may be exercised by the states. In *Owners of Brig James Gray v. Owners of Ship John Fraser*, 21 How. 184, it was held that an ordinance of the city of Charleston, prescribing where a vessel may lie in the harbor, how she may lie there, and what light she must have at night, is not in conflict with any law of Congress, regulating commerce, or with the general admiralty jurisdiction conferred on the courts of the United States. And the ordinance was held valid. In *Ex parte McNiel*, 13 Wal. 236, it was held that the statutes of the several states, regulating the subject of pilotage, are constitutional until Congress, by its own act, supersedes them. *Cooley v. The Board of Wardens, etc.*, 12 How. 299; *Osborne v. Mobile*, 16 Wal. 479; *Chicago and N. W. R. W. Co. v. Fuller*, decided by Supreme Court U. S. 1871 (published in Chicago Legal News, vol. 6, p. 133, Jan. 17th, 1874).

We do not deem it necessary to make further reference to the several cases bearing upon the question under consideration. To do so would extend this opinion to an undue length.

The section of the law, under which the action is prosecuted, simply provides, that when the death of any one is caused by the wrongful act or omission of another, the personal representative of the deceased may maintain an action therefor, if he might have maintained one for an injury for the same act or omission. It requires nothing new to be done or omitted, and prescribes no rules touching the vessels or their management. It gives a right of action where none existed before. The right of action in favor of

the person killed died with him. No action could be maintained for the death of another, unconnected with the loss of services before the law. The right of action, which the deceased had at his death, is not by the law transferred to his representatives, but it gives to them a totally new one on different principles. *Blake* v. *The Midland R. W. Co.*, 10 Eng. L. & Eq. 437; *Whitford* v. *The Panama R. R. Co.*, 23 N. Y. 465. Yet by the terms of the act, no action can be maintained under it, unless the act or omission causing the death was such that the deceased might, if alive, maintain an action for an injury caused by the same act or omission. That provision is inserted, for the purpose of defining the degree of delinquency with which the party must be chargeable, in order to subject him to the action. The action is to be prosecuted against the person of the party causing the death, and we are unable to see how it can, in any manner, interfere with or tend to regulate commerce among the states, or hinder or obstruct the free use of a license granted under an act of Congress, when prosecuted against the owners of a steamboat, engaged in such commerce, under such license.

But it is claimed further, that the two states cannot exercise concurrent legislative jurisdiction over the same territory, on account of practical difficulties; that the laws enacted by them on the same subject may be, and in this instance are, different and inconsistent. We admit that the difficulties do, or rather, may exist. The fact that they do does not and cannot defeat such jurisdiction however. That exists. Each state is created subject to it. It is not exclusive in either. So far as the acts of the two states on this subject differ, we do not think there can be any real difficulty. If actions are prosecuted in both states, a judgment in one will be a bar to the other. There can be but one judgment and satisfaction for the same death. Even if judgment shall be rendered in each case, still the satisfaction of one will be a satisfaction of the other. If the jurisdiction is not concurrent in both states, it does not exist in either, and the Ohio

river is exempt from all legislative control, except such as may be exercised by Congress. There is no grant of exclusive jurisdiction to either. On the contrary, the provision is, that it shall be concurrent. The fact that the river is within the boundaries of Kentucky does not relieve us of the difficulty or give that State exclusive jurisdiction, in the face of the provision that it shall be only concurrent with Indiana.

We are of the opinion that the law applies to cases where death is caused by wrongful acts or omission on vessels, whilst navigating the Ohio river under license, under the acts of Congress, by the owners or their agents, officers, and servants in charge of such vessels; that it is not invalid as tending to regulate commerce among the states, or as hindering or obstructing the free use of the license under which such owners may be navigating the river.

A judgment was rendered in a state court of Rhode Island against the American Steamboat Company for negligently running over and killing George Cook on Narraganset Bay. The action was by the administrator of Cook, under a law substantially like ours. It was objected that the state court had not jurisdiction of the cause of action. The jurisdiction was maintained by the Supreme Court of the United States, where the judgment of the state court was affirmed. *Steamboat Company* v. *Chase*, 16 Wal. 522. On page 531, it is said: "Undoubtedly the general rule is that state laws cannot extend or restrict the jurisdiction of the admiralty courts, but it is suggested that the action may be maintained in this case, without any departure from that principle, as the only practical effect allowed to the state statute is to take the case out of the operation of the common law maxim, that personal actions die with the person.

"Sufficient has already been remarked to show that the state courts have jurisdiction if the admiralty courts have no jurisdiction, and a few observations will serve to show that the jurisdiction of the state courts is equally undeniable if it is determined that the case is within the jurisdic-

tion of the admiralty courts." It was held that the rule was applicable in all cases where the action was in form a common law action against the person, without any of the ingredients of a proceeding *in rem* to enforce or maintain a lien. If the suit is *in rem*, against the thing, the original jurisdiction is exclusive in the district court; but when it is *in personam*, against the owner, the party may proceed by libel in the district court, or he may, at his election, proceed in an action at law, either in the circuit court of the United States, if the citizenship of the parties is such as to give that court jurisdiction, or in a state court, as in other cases cognizable in the state and federal courts, exercising jurisdiction in common law cases. And the court also held that the common law remedy existed and might be enforced in state courts, although the action was created by a state statute enacted subsequent to the passage of the judiciary act. On the subject of the survivorship of actions for personal injuries, the court said: "Nearly all the states have passed laws to prevent such a failure of justice, and the validity of such laws has never been much questioned."

The sixth paragraph of the answer raises the question, whether the receipt of a sum of money by the persons for whose benefit the action is prosecuted, on account of a policy of insurance on the life of the deceased, can be shown to reduce the amount of the recovery. The argument urged in support of the position is, that the damages are recoverable for the death, and when that death brings money, which might not otherwise come to the party, a pecuniary benefit to the extent of the amount received has accrued to the party from the death; that if the wrongful act, causing the death, has been the occasion of pecuniary benefit, the pecuniary damage cannot be ascertained without deducting from the whole damage the pecuniary benefit. If the argument is sound, it would apply to a case where the pecuniary benefit resulted by descent or devise. It proposes to use, as a defence to damages resulting from the wrongful act of the defendants, by way of set-off, recoupment, or in mitigation of

such damages, pecuniary benefits received by the injured party, to which the defendants had not contributed, and not resulting from, or connected with, the act causing the death—benefits, which it is fair to presume would have been realized at a future day, without the aid of their wrongful act. To allow such a defence would defeat actions under the law, when the party killed had, by his prudence and foresight, made provision or left means for the support of his wife and children, and the wrong-doer would thus be enabled to protect himself against the consequences of his own wrongful act. "If the person injured had survived and recovered, he would have added so much to his personal estate, which the law, on his death, if intestate, would have passed to his wife and next of kin; in case of his death by the injury the equivalent is given by a suit in the name of his representative." *Railroad Co. v. Barron,* 5 Wal. 90, 105.

In *Althorf* v. *Wolfe,* 22 N. Y. 355, which was an action on a statute similar to ours, the court refused to instruct the jury to take into consideration, in assessing the damages, the money received by the widow on a policy of insurance on the life of her deceased husband. On appeal, the judgment for the plaintiff was affirmed. So, "where the whole loss by collision of two vessels has been paid by the underwriters on one of them, and the owners of that one sue those of the other, on account of the collision, the latter have no right, in determining the damage, to deduct the amount so paid by the insurers." Phillips Insurance, sec. 2163. No case has been found recognizing the doctrine claimed, and we are not willing to be the first to sanction it.

The court instructed the jury that if they found from the evidence that the defendants were the owners of the boats, and that they were engaged in carrying passengers thereon, the law imposed upon them, their agents, servants, and employees the duty of exercising the highest degree of care in the navigation and management of their boats, but that they were not insurers or bound to carry passengers safely at all events.

The defendants requested the court to instruct the jury, that they were bound to use all such care and skill, to carry their passengers safely, as are ordinarily used and exercised by carriers of passengers on steamboats on the western rivers; that if they employed officers and persons to navigate their boats, possessing such skill in their respective positions on said boats as is commonly and ordinarily possessed by persons in that particular business, and if that degree of care and skill was exercised, the defendants were not liable, which was refused.

The rule, as stated by the court, is the true one as between passenger and carrier. *The Jeffersonville R. R. Co.* v. *Hendricks' Adm'r*, 26 Ind. 228. On p. 231, the court say : " They are required to exercise the highest degree of care to secure the safety of passengers, and are responsible for the slightest neglect, if an injury is caused thereby." *Thayer* v. *The St. Louis, etc., R. R. Co.*, 22 Ind. 26; *Gillenwater* v. *The Madison, etc., R. R. Co.*, 5 Ind. 339; *Stokes* v. *Saltonstall*, 13 Pet. 181 ; *Caldwell* v. *Murphy*, 1 Duer, 233. In the case last cited, the court on page 241 say : " Having thus provided the means of transport, they are in like manner bound to use the utmost care and diligence in the managing, directing, and using those means, so that, as far as human care and foresight can go, they may guard against injury. Having done all that human care and foresight can do, and loss happening, they are not liable. Human life is too valuable to be required absolutely at the hands of those who have done all that the utmost care and foresight can do for its protection. But the magnitude of its value, at the same time, requires of carriers of passengers such extreme care and foresight." *Ingalls* v. *Bills*, 9 Met. 1 ; *The Camden, etc., Co.* v. *Burke*, 13 Wend. 611. The carrier of passengers is not an insurer or guarantor. For goods, the carrier is answerable at all events, but he does not warrant the safety of passengers. His contract with them is to provide for their safe conveyance, as far as human foresight will go. His liability as a carrier of goods is that of an insurer or guarantor, and accident is no excuse;

whilst as a carrier of passengers, he is liable only for negligence. 1 Redf. Railw. 625; 2 Redf. Railw. 87, sec. 176, and notes; *Philadelphia, etc., R. R. Co.* v. *Derby*, 14 How. 468. The request of the appellants was, that the jury should be instructed to find that a carrier of passengers is only required to exercise such care and skill as are ordinarily exercised on steamboats on the western rivers.   It measured the care and skill to be used, not by what was necessary and proper for the safety of passengers, but by what was ordinarily possessed and exercised by others.

The appellants insist that there can be no wrongful act or omission, if the party has exercised due and ordinary care ; that the law requires no more than ordinary care and skill of any one, to free him from the charge of wrong.   The degree of care and skill required depends upon the relation of the parties.   If the injured party be not a passenger, the defendant would not be required to exercise that degree of vigilance which would be required toward a passenger. Toward one, the liability would spring from a contract, express or implied, and upheld by an adequate consideration. Toward the other, there would be no obligation but that of justice and humanity.

The appellants also requested the court to give to the jury the following instruction :

" 10. In respect to the degree of negligence on the part of the defendants on another steamer, and on which deceased was not a passenger, I say defendants were bound through their employees to exercise, in respect to deceased, common, ordinary care and skill and prudence only, such as any man is bound to observe in the use of his 'own property, and in the exercise of his own rights—not to use or exercise the other in such a careless manner as to injure another."   The court refused to comply with the request.

No authority is cited or reason given in support of the instruction, and we know of none.   The two boats were owned by the appellants ; both were running in the same line as carriers of passengers.   The deceased was their pas-

senger and travelling on one of their boats. They cannot escape by a discharge of their duty on the particular vessel, upon which he took passage and was being transported, if in consequence of a failure to exercise the same degree of care on the other vessel, the deceased lost his life. We do not think that the carrier has discharged his whole duty by exercising proper care and skill, with reference to the particular vessel or vehicle upon which he is carrying his passengers. In our opinion, the same degree of vigilance is required by him in the management of others employed and in connection with the same business. *Philadelphia and Reading Railroad Co.* v. *Derby,* 14 How. 468.

Other instructions were requested and refused on this subject, but as they all involved substantially the same thing, it is not necessary to notice them specifically.

The appellants complain of the following instruction and say that it substantially took the case from the jury:

" 7. If the jury find from the evidence that the employees of the defendants, engaged in navigating said boats, just before the collision, saw each the other boat, while they were from two to three miles apart, and if the jury find that the said boats were accustomed to pass at and about the same point, and if the jury find that the river at the point of collision was wide enough for said boats to pass without danger, with proper care, and if the jury find that the collision did occur there, such circumstances tend to show negligence, and it devolves on the defendants to show that the collision was not caused by their neglect or omission."

We see no objection to the charge. It informs the jury that if certain facts are found from the evidence, they tend to show negligence, and that the defendants must show that the collision was not caused by their neglect. In other words, that, *prima facie,* the charge of negligence is made out. It must be considered with reference to the relation of the parties. The boats were in sight of the persons in charge of them for two or three miles; they were accustomed to pass at about the same point, so that they would be on the

lookout and more than ordinarily watchful ; the river was wide enough for the boats to pass without danger, with proper care. We think that if those facts were found by the jury, they did so far show negligence that it devolved upon the defendants to rebut the presumption of a want of proper care in passing.

If, as is suggested, some sudden, unexpected thing occurred just before the collision, which could not, with due care, have been avoided, it was for the defendants to show it. *Mc-Kinney* v. *Neil,* 1 McLean, 540. In that case, Judge McLEAN charged the jury that the upsetting of the stage was *prima facie* evidence of negligence, and to sustain his action it was only necessary for the plaintiff to show that he was a passenger and that he was injured by the upsetting of the stage. *Stokes* v. *Saltonstall,* 13 Pet. 181. In that case, the instructions were substantially the same as in the case of *McKinney* v. *Neil,* and the Supreme Court held they were correct. *Holbrook* v. *The U. & S. Railroad Co.,* 16 Barb. 113 ; S. C., 2 Kern. 236. Proof of the injury does not raise a presumption of negligence. But where it is shown that the injury is caused by a collision of the vessel, car, or vehicle in which the passenger is being carried, with another, the presumption of negligence immediately arises. Ordinarily, the circumstances attending the injury are shown in proving the injury and its cause, and, of course, it is immaterial who introduces the evidence. But that does not affect the rule of law laid down in the instruction.

The following instruction was asked by the appellants : " 15. The burden of making out all the material facts of carelessness, causing the death of Sappington, is upon the plaintiff and does not change in any progress of the case." The court refused to give it as asked, but gave it with the addition, " Except as to the United States giving the first signal, if she did so, as I have before explained to you."

The following portion of the general charge was the explanation referred to : " There are no doubt circumstances that would render it proper for the descending boat to sig-

nal first, but there must be some palpable necessity for it, involving the safe navigation and security of the descending boat; and a violation of the rule, in this respect, resulting in disaster, raises a presumption of culpability, which can only be removed by proof that the collision is attributable to some other causes. If you find from the evidence that there was a collision between the defendants' steamboats, United States and America, and that the United States was the descending boat, and the America was the ascending boat, and that the United States first signaled to pass, and that there was a collision between said boats, and that the deceased was a passenger on the United States, and that in consequence of such collision, the United States was set on fire and burned, and that the deceased lost his life by the collision, or was suffocated or burned to death by the fire occasioned by such collision, then the burden of proof is upon the defendants to show that there was some necessity for the United States giving the first signal, as that the navigation was dangerous, that the darkness of the night, the narrowness of the channel, the close and dangerous proximity of the boats, or some other cause which rendered it necessary that the signal should be given, and the rules of navigation departed from." ·

The ·rules of navigation spoken of are those prescribed by the Board of Supervising Inspectors, under an act of Congress, approved Aug. 30th, 1852, 10 U. S. Stat. at Large, 61, which, so far as it is claimed they affect this case, are as follows:

" RULE 1.—When steamers are approaching each other, the signal for passing shall be one sound of the steam-whistle to keep to the right, and two sounds of the steam-whistle to keep to the left. These signals to be made first by the ascending steamer. If the dangers of navigation, darkness of the night, narrowness of the channel, or any other cause, render it necessary for the descending boat to take the other side, she can do so by making the necessary signals, and the ascending steamer must govern herself accordingly. These signals to be observed by all steamers, either day or night.

"RULE 2.—Should steamers be likely to pass near each other, and these signals should not be made and answered by the time such boats shall have arrived at the distance of eight hundred yards from each other, the engines of both boats shall be stopped; or should the signal be given and not properly understood from any cause whatever, both boats shall be backed until their headway shall be fully checked, and the engines shall not be again started ahead until the proper signals are made, answered, and understood.

"RULE 10.—Doubts or fears of misunderstanding signals may be expressed by several short sounds of the whistle in quick succession."

Section 29 of the act of Congress provides, that if any pilot, engineer, or master of any such vessel shall neglect or wilfully refuse to observe such rules, he shall be liable to a penalty of thirty dollars and to all damage done to any passenger in his person or baggage by such neglect or refusal, "and no such vessel shall be justified in coming into collision with another, if it can be avoided."

The substance of the instruction as given was, that the burden of proof of all the material facts of carelessness, causing the death of the deceased, remained with the plaintiff and did not change in any progress of the case; but if it was shown that the United States, the descending boat, departed from the rules of navigation and gave the first signal to pass, then the burden of proof was upon the defendants to show that there was a necessity for it.

One of the acts of carelessness alleged in the complaint is, that the pilot of the United States gave the first signal, in violation of the rules of navigation. If that was shown to be true, it was *prima facie* an act of carelessness, and the *onus* was upon the defendants to show a necessity for such departure from the rules.

"Where the party having the burden of proof gives competent and *prima facie* evidence of a fact, and the adverse party, instead of producing proof which would go to negative the same proposition of fact, proposes to show another

and a distinct proposition which avoids the effect of it, there the burden of proof shifts, and rests upon the party proposing to show the latter fact." *Powers* v. *Russell*, 13 Pick. 69, 77. It will be observed, that the addition to the charge asked makes the exception, upon the condition that the jury find that the first signal was given by the descending boat. The language is, "if she did so, as I have before explained to you." The language used in the cases of *Central Bridge Cor.* v. *Butler*, 2 Gray, 130, and *Delano* v. *Bartlett*, 6 Cush. 364, when applied to the facts in those cases, is not in conflict or inconsistent with that quoted from 13 Pick., *supra*. Indeed, the same language was quoted in the case of *Delano* v. *Bartlett*.

In the case at bar, the proposition of fact which the plaintiff was required to prove was, that the descending boat gave the first signal to pass. The charge of the court did not relieve him from the burden of proof of that fact. As to all the evidence upon that point, the burden remained upon him. If evidence was before the jury tending to negative such fact, the jury would be required to weigh and consider it in deciding the question. But such fact being found to be true, then as to the other proposition of fact, which was an excuse for such departure from the rules of navigation, the burden of proof shifted and rested upon the defendants. We think it may be said, that when a particular fact is proved by the party alleging it, and the adverse party seeks to avoid the effect of it, by the proof of other affirmative and independent facts, the burden of proof of such affirmative facts is upon the latter.

Other instructions were given and refused, and exceptions taken. But we think they involved substantially the same questions already discussed, and therefore deem it unnecessary to further consider them.

The seventh cause for a new trial is, that the court erred in excluding evidence offered by defendants, and excepted to; and the court erred in admitting evidence offered by plaintiff and objected to by defendants, to which they

excepted.   It was too indefinite and uncertain to raise any question.   Neither the names of the witnesses nor the character of the testimony were specified.   *Eden* v. *Lingenfelter*, 39 Ind. 19;  *Cass* v. *Krimbill*, 39 Ind.  357 ;  *Wright* v. *Potter*, 38 Ind. 61 ;  *Mooklar* v. *Lewis*, 40 Ind.  1 ;  *Alley* v. *Gavin*, 40 Ind. 446.

Another cause was, that the court erred in refusing to let C. G. Pearce testify, when offered by defendants.

Pearce was a defendant in the action, and the court refused to allow him to testify on that ground.   The proviso in section 2 of the act defining who may be witnesses, etc., approved May 11th, 1867, 3 Ind. Stat. 561, declares, "that in all suits where an executor, administrator or guardian is a party in a case where a judgment may render either for or against the estate, represented by such executor, administrator or guardian, neither party shall be allowed to testify as a witness unless required by the opposite party, or by the court trying the cause."   *   *   *   The witness offered was clearly within the letter of the law.   He was a party to the action, and judgment might be rendered for the administrator.   The language of the statute is clear and explicit and unmistakably renders both parties incompetent to testify in his own behalf, in any case where an administrator is a party, and where a judgment might be rendered for or against such administrator.   An administrator might be a party to an action where no judgment could be rendered for or against him ; as in an action on a note assigned by delivery, without endorsement by the decedent, when the administrator is made a party to answer as to the interest of the estate in the note.   In such a case undoubtedly, the proviso would not render the parties incompetent to testify.

We have examined the evidence and think it sustains the verdict of the jury

The judgment of the said Switzerland Common Pleas is affirmed, with costs and two per cent. damages.

Appealed to the Supreme Court of the United States.—*Rep.*